**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**CHRISTOPHER C. DIGGS**                                    **PLAINTIFF**

**VS.**                                    **CIVIL ACTION NO. 1:15CV186-SA-DAS**

**THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY**                                    **DEFENDANT**

<u>**MEMORANDUM SUPPORTING DEFENSE SUMMARY JUDGMENT MOTION**</u>

BNSF Railway Company[1] ("BNSF") seeks summary judgment dismissing this employment discrimination suit because there is no evidence of any race or disability-based disparate treatment.

<u>**SUMMARY**</u>

Plaintiff Christopher Diggs, a BNSF train-service employee, claims that BNSF unlawfully delayed his return to work from a medical leave of absence because of his race and disability, in violation of Title VII, 42 U.S.C. § 1981, and the Americans with Disabilities Act. In January 2009, Mr. Diggs requested and was granted a medical leave of absence due to what he reported were disabling foot injuries that he attributed to extensive walking on large track ballast and uneven surfaces, often while carrying heavy objects. For the next 66 months, he insisted that he could not return to work because he was totally disabled. Then, in late 2014, after he lost his personal-injury lawsuit against the railroad, he announced that he was medically fit to return to active duty with no restrictions. Before clearing him to return to work, BNSF's evaluating physician, Dr. Laura Gillis, followed standard practice for the Medical and Environmental Health Department by requiring him to provide the medical records and information underlying his treating physicians' opinions so that she could review them and determine whether he was fit

---

[1] BNSF was incorrectly named in Plaintiff's Complaint as "The Burlington Northern and Santa Fe Railway Company."

to return to the physically demanding and safety sensitive job of train-service employee. Although Diggs faults her for not simply deferring to his physicians' fitness opinions, he has no evidence that race or disability discrimination motivated her. In particular, he cannot identify a comparator whom Dr. Gillis treated more favorably under substantially similar circumstances. Mr. Diggs' claims are ripe for summary judgment.

<u>**UNDISPUTED MATERIAL FACTS**</u>

I.     **Christopher Diggs took medical leave from a physically demanding job in 2009 due to disabling foot injuries.**

Mr. Diggs is a union-represented, African-American, BNSF train yard & engine ("TY&E" or "train-service") employee assigned to BNSF's Amory, Mississippi rail yard. Train-service employees are responsible for operating BNSF trains and engines, performing tasks that require working outside in all weather conditions; walking on uneven surfaces; lifting up to 90 pounds; climbing trains, ladders, and other equipment; and bending, lifting, walking, standing or sitting for extended periods of time. (*See, e.g.,* Job Posting for Conductor Trainee, Motion Exhibit 1; TY&E Safety Rules, Motion Exhibit 2.) They work in an unforgiving environment— on and around massive, moving trains and on-track equipment. (*See, e.g.,* Motion Exhibit 2, at 7 ("Expect the movement of trains, engines, cars, or other equipment at any time, on any track, and in either direction")).

In January 2009, Mr. Diggs requested a medical leave due to disabling foot injuries that he attributed to "extensive walking on large track ballast[2] and uneven surfaces…often while carrying heavy objects." (*See* FELA Complaint, Motion Exhibit 3, at ¶5.)     BNSF granted his request.

---

[2] Track ballast, frequently made of crushed stone, forms the bed on which railroad tracks are laid.

More than a dozen times during his leave, employees from BNSF's Medical and Environmental Health Department ("Medical Department") offered to help Mr. Diggs return to work.[3] BNSF also repeatedly extended Mr. Diggs' leave, so as to enable him to remain a BNSF employee. (*See* Declaration of Laura Gillis, Motion Exhibit 17 and Diggs deposition excerpts, Motion Exhibit 18, at 30:21-31:6).

## II.    Mr. Diggs' medical condition worsened after he took leave, and he declared himself disabled.

After taking leave, Mr. Diggs' medical problems worsened.  He was diagnosed with diabetes in June 2009, which he said "only complicates my condition.  Furthermore, I have been instructed by [a podiatrist] to stay off my feet as much as possible.  Standing, sitting or any stress put on my foot puts me at greater risks of getting infection in my foot and increases the chances of more bone spurs."  (*See* July 7, 2010 letter from Diggs, Motion Exhibit19).  On July 14, 2010, Mr. Diggs related that he thought he could return to work but that his podiatrist counseled against it:  "Dr. Calvert thinks that in the long run I will do more damage to my foot."  (*See* July 14, 2010 e-mail from Diggs to Ouellette, Motion Exhibit 20.)

 Dr. George Housley, who began treating Mr. Diggs for myositis[4] during his leave, opined that Mr. Diggs was fit only for "a job that is deemed sedentary."  "This patient is unable to perform manual labor," he wrote.   (*See* Undated letter from George Housley, Motion Exhibit 21.)

---

[3] *See* July 2009, letter from Brett Ouellette to Diggs, Motion Exhibit 4; March 9, 2010, letter from Ouellette to Diggs, Motion Exhibit 5; April 16, 2010 letter from Ouellette to Diggs, Motion Exhibit 6; May 28, 2010, letter from Ouellette to Diggs, Motion Exhibit 7; June 18, 2010 letter from Ouellette to Diggs, Motion Exhibit 8; July 16, 2010 letter from Ouellette to Diggs, Motion Exhibit 9; October 4, 2010, letter from Benjamin Gillam to Diggs, Motion Exhibit 10; December 8, 2010 letter from Gillam to Diggs, Motion Exhibit11; May 26, 2011 letter from Gillam to Diggs, Motion Exhibit 12; March 13, 2013 letter from Gillam to Diggs, Motion Exhibit 13; June 3, 2013 letter from Gillam to Diggs, Motion Exhibit 14; February 3, 2014 letter from Gillam to Diggs, Motion Exhibit 15; April 22, 2014 letter from Gillam to Diggs, Motion Exhibit 16.

[4] Myositis weakens and inflames the muscles.

During his leave, Mr. Diggs claimed total disability in multiple legal proceedings, including an application to obtain disability benefits from the federal government and a personal-injury lawsuit against BNSF. The Railroad Retirement Board deemed him unable to return to his former work for BNSF, but not disabled from all gainful employment. (*See* Diggs deposition excerpts, Motion Exhibit 18, at 40:4-21.)

At no point before summer 2014 did Mr. Diggs' own physicians inform him or BNSF that he might be able safely to return to his former work for BNSF. (*See* Gillis Declaration, Motion Exhibit 17, and Diggs deposition excerpts, Motion Exhibit 18, at 43:20-24.)

III.    **In 2014, after an absence of more than five years, Mr. Diggs asked to return to his job at BNSF, and BNSF's Medical Department issued standard requests for his medical records.**

Then, in a to-whom-it-may concern letter dated July 7, 2014 and not accompanied by medical records, Mr. Diggs' podiatrist acknowledged that Mr. Diggs remained unable to return to work but added: "I feel that within the next four weeks, Mr. Diggs will be able to return to his job with Burlington Northern Santa Fe Railroad. He may return to work on 08/04/2014. Anticipated activity restrictions are as follows: none." (*See* July 7, 2014 Letter from Preston Boles, Motion Exhibit 22). Learning of Mr. Diggs' desire to return to work led BNSF's Medical Department to ask him for up-to-date medical information, including the medical records underlying his podiatrist's note releasing him to return to work.[5] On July 30, 2014, Medical Specialist Cheryl Renee Kimbriel asked Mr. Diggs to complete a medical questionnaire as the "first step" in BNSF's fitness-for-duty process. (*See* July 30, 2014 Letter from Kimbriel, Motion Exhibit 23). Mr. Diggs returned a medical questionnaire which showed he had been diagnosed

---

[5] This was not the first time the Medical Department had requested medical records from Mr. Diggs. From their first communications in 2009, BNSF's Medical Department had repeatedly informed Mr. Diggs that it would need records from his medical providers in order to assist him in a return to work. (*See* July 9, 2009, letter from Ouellette, Motion Exhibit 4).

with diabetes, been treated for myopathy and had undergone surgery since the date of his last active employment in 2009.  (*See* August 4, 2014 Letter from Diggs, Motion Exhibit 24).

These disclosures about Mr. Diggs' medical problems during his leave prompted additional questions from the Medical Department regarding his physical ability to perform his duties safely.  Dr. Laura Gillis, BNSF's medical director,[6] articulated those questions in an August 20, 2014 letter.  (*See* August 20, 2014, Letter from Dr. Laura Gillis, Motion Exhibit 25). She asked Mr. Diggs for "a detailed history of [his] condition(s), current functional status, any symptoms, treatment plan including need for medications, any medication side effects, [and] any recommended activity restrictions and prognosis."  *Id.*  Also, because Mr. Diggs had been diagnosed with diabetes since 2009, Dr. Gillis followed her standard practice by asking that he fill out an enclosed medical status form regarding the status of his treatment for diabetes.  *Id.*

## IV.   Mr. Diggs responded to BNSF's medical records requests in dribs and drabs, not providing all requested records until September 2016.

Thereafter, BNSF received partial responses to its requests and repeatedly informed Mr. Diggs that he had failed to provide complete information.  On November 3, 2014,[7] Dr. Boles sent BNSF a three-sentence letter acknowledging that Mr. Diggs was his patient and opining that he was able to return to work.  (*See* November 3, 2014 Letter from Preston Boles, Motion Exhibit 27).  On December 8, 2014, Dr. Gillis explained to Mr. Diggs that she had received none of the information requested on August 20, 2014, except for the letter from Dr. Boles, and that the information received from Dr. Boles was inadequate for a return-to-work determination as it lacked requested details about Mr. Diggs' current conditions as well as the chronic foot issues

---

[6] Dr. Gillis holds a medical degree with a specialty in occupational health, as well as a master's degree in public health, and is a fellow of the American College of Occupational and Environmental Medicine.

[7] Dr. Boles has not seen Mr. Diggs or communicated with BNSF since November 3, 2014, before Dr. Gillis informed Mr. Diggs that she needed more information from Dr. Boles.  (*See* Preston Boles deposition excerpts, Motion Exhibit 26, at 37:9-11, 40:11-20.)

that had forced him from work. (*See* December 8, 2014 Letter from Gillis, Motion Exhibit 28). On January 2, 2015, Dr. Gillis noted continuing deficiencies in Mr. Diggs' medical records, pointing out to him that, even in the records he had provided, there were references to medical records he had not yet given to her. (*See* January 2, 2015 Letter from Dr. Gillis, Motion Exhibit 29 (citing, among other items, that a cover letter from one of Mr. Diggs' doctors refers to enclosed visit notes that were not actually enclosed).) On April 8, 2015, Dr. Gillis re-sent Mr. Diggs a copy of her January 2 letter and reiterated her inability to determine Mr. Diggs' fitness for duty on his current, incomplete medical record. (*See* April 8, 2015 Letter from Gillis, Motion Exhibit 30.) Mr. Diggs himself acknowledged that he'd not given Dr. Gillis everything for which she had asked, telling an Equal Employment Opportunity Commission investigator on April 24, 2015, that he was "still in the process of submitting documentation to [BNSF] that was requested that he submit in order to return back to his job." (*See* EEOC Case Log, Motion Exhibit 31.)

Nearly a year later, still lacking the requested information from Mr. Diggs, Dr. Gillis wrote him again to request it. (*See* February 5, 2016 Letter from Gillis, Motion Exhibit 32.) Following that correspondence, Dr. Gillis continued to urge him to provide the required documents, writing him on five more occasions and extending his leave five more times as Mr. Diggs gradually gathered and provided the requested medical information. (*See* Gillis Declaration, Motion Exhibit 17, at ¶12.)

BNSF did not terminate Mr. Diggs' employment; rather, he remained on vocational rehabilitation status during this time.[8] Finally, on September 9, 2016, Mr. Diggs' lawyers

---

[8] *See* Gillis Declaration, Motion Exhibit 17; Motion Exhibit 32; March 4, 2016, Letter from Rachel Pierce Waide, Motion Exhibit 33; March 22, 2016, Letter from Gillis, Motion Exhibit 34; April 21, 2016, Letter from Waide, Motion Exhibit 35; June 23, 2016, Letter from Waide, Motion Exhibit 36; July 1, 2016, Letter from Waide, Motion Exhibit 37; July 8, 2016, Letter from Gillis, Motion Exhibit 38; August 8, 2016 Letter from Waide, Motion

provided the final missing piece of his medical record—information from the Oxford Medical Clinic regarding whether his diabetes was now under control.  Dr. Gillis reviewed his file and released him on September 12 for full-duty work.  (*See* Gillis Declaration, Motion Exhibit 17.) That same day, Dr. Gillis had Medical Specialist Kimbriel telephone Mr. Diggs to inform him of the news.[9]

Dr. Gillis, who began work for BNSF in late June 2013, has never met Mr. Diggs. (*See* Gillis Declaration, Motion Exhibit 17, and Diggs deposition excerpts, Exhibit 18, at 26:14-19.) Before Mr. Diggs filed this suit, Dr. Gillis was not aware of his race.  (*See* Motion Exhibit 17.) Nor is she aware of a similarly situated employee—*i.e.*, a train yard worker in vocational rehabilitation status, having claimed permanent disability, seeking years later her determination that he is fit to return to active duty—from whom she did not require relevant medical records before making a fitness-for-duty determination.  *Id.*

Dr. Gillis' requests for Mr. Diggs' medical records comport with Medical Department practice, which requires employees absent on medical leave for more than a year to disclose detailed information, including a completed Medical Department questionnaire, before returning to work.  (*See* Gillis deposition excerpts, Motion Exhibit 45, at 16:7-20; Gillis Declaration, Motion Exhibit 17.)  Mr. Diggs had been absent for five years at the time he asked to return to work.  Mr. Diggs acknowledged "several chronic medical problems," including uncontrolled diabetes, myositis and podiatric problems that had forced him to take leave in 2009 and prompted a physician to opine that a foot amputation might be necessary.  (*See* Gillis deposition

---

Exhibit 39; August 9, 2016, Letter from Waide, Motion Exhibit 40; August 10, 2016, Letter from Gillis, Motion Exhibit 41; August 17, 2016, Letter from Gillis, Motion Exhibit 42; August 30, 2016, Letter from Waide, Motion Exhibit 43; September 2, 2016, Letter from Gillis, Motion Exhibit 44.

[9] Federal Railroad Administration rules required that Mr. Diggs have his vision and hearing checked before returning to work.  Mr. Diggs scheduled an appointment for that hearing and vision screening, and, on September 28, 2016, the Medical Department learned that he had passed the exam.

excerpts, Motion Exhibit 45, at 31:21-35:8.)   Dr. Gillis' undisputed testimony is that she requested records relevant to those conditions in order to investigate Mr. Diggs' ability to perform essential job functions. *Id.*

## SUMMARY-JUDGMENT STANDARD

To avoid summary judgment, Mr. Diggs must produce evidence of specific facts that demonstrate that a genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). "The once frequently repeated characterization of summary judgment as a disfavored procedural shortcut no longer appertains. Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant, or where it is so overwhelming that it mandates judgment in favor of the movant." *Armstrong v. City of Dallas*, 997 F.2d 62, 66-67 (5th Cir. 1993). *See also Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999) (same). Mr. Diggs may not defeat it by pointing to "conclusory allegations," "a scintilla of evidence," or "some metaphysical doubt as to the material facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Likewise, "[h]earsay evidence inadmissible at trial cannot be used to create a genuine issue of material fact to avoid summary judgment." *Harris v. Pontotoc Co. Sch. Dist.*, 635 F.3d 685, 692 (5th Cir. 2011).

Mr. Diggs "can prove disparate treatment" under Title VII or the ADA either by (1) direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) indirect evidence, by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014); *TWA v. Thurston*, 469 U.S. 111, 121 (1985); *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016). "Direct evidence is evidence which, if believed, proves [disparate treatment] without inference or presumption." *Jones v.*

*Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). For reasons discussed below, the record contains no admissible direct evidence of prohibited discrimination against Mr. Diggs.

Because Mr. Diggs has no direct evidence to support his claims, the legal standards applicable to his suit are the shifting burdens of production and proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226-227 (5th Cir. 2015). Specifically, under Title VII and 42 U.S.C. § 1981, he must show that "(1) he belongs to a protected group; (2) [he] was qualified for his position; (3) [he] suffered an adverse employment action; and (4) … in the case of disparate treatment, . . . similarly situated employees were treated more favorably." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2001)). Under the ADA, Mr. Diggs "must show (1) he has a disability; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016) (internal citation and quotation marks omitted).

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to rebut the presumption of discrimination by producing evidence that the adverse employment action was taken for a non-discriminatory reason. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas*, 411 U.S. at 802. Though the burden of production then shifts to the employer, the burden of persuasion remains at all times on the plaintiff. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Indeed, the employer's reason for the adverse employment action need not be persuasive or credible. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002). Instead, the defendant's burden is to "produce evidence

'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quoting *Hicks*, 509 U.S. at 509).

Once the employer meets its burden, the plaintiff may demonstrate that the proffered reason was mere pretext. *Reeves*, 530 U.S. at 143; *McDonnell Douglas*, 411 U.S. at 804. Once a case reaches this pretext stage, "the <u>only</u> question on summary judgment is whether there is a conflict in <u>substantial evidence</u> to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (emphasis added); *see also Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1185 (5th Cir. 1997) ("[P]laintiff's case must, at the very least create a conflict of substantial evidence from which the jury may infer illegal discrimination"). "The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." *Swanson*, 110 F.3d at 1185.

## <u>ARGUMENT & AUTHORITIES</u>

Mr. Diggs' Complaint alleges disparate treatment by BNSF in violation of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. But those disparate-treatment claims each lack an essential ingredient: evidence that Mr. Diggs has been treated disparately. Bereft of material facts sufficient to support a finding that BNSF has treated Mr. Diggs differently than comparable employees, the record requires dismissal of his Complaint.

**I. There is no direct evidence of prohibited discrimination against Mr. Diggs by BNSF under Title VII or the ADA.**

Mr. Diggs has no direct evidence of race or disability discrimination. Direct evidence is "evidence that, if believed, proves the fact of discriminatory animus without inference or

presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "To qualify as direct evidence of discrimination" in the Fifth Circuit under either ADA or Title VII, alleged statements must be 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the adverse employment action; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764-765 (5th Cir. 2016); *see also Reed v. Neopost U.S., Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (noting that Fifth Circuit applies the four-part test to comments presented as direct evidence of discrimination in "federal discrimination claims"). Moreover, even if a statement is direct evidence, it may be excluded from consideration on summary judgment if it is inadmissible hearsay. *See Fairchild*, 815 F.3d at 965-967; *Harris*, 635 F.3d at 692 ("Hearsay evidence inadmissible at trial cannot be used to create a genuine issue of material fact to avoid summary judgment").

In this case, Mr. Diggs posits that the following deposition testimony from BNSF manager Isiah Waller reveals direct evidence of discrimination by BNSF against Mr. Diggs:

> Q. Do you recall ever going to Oxford and talking to Mr. Diggs sometime around October 2014?
>
> A. I've been to Oxford. Probably that date would be about right.
>
> Q. According to Mr. Diggs, you had a conversation in the parking lot of the Burns United Methodist Church sometime about October 2014?
>
> A. That probably could be right. I know the parking lot was right across from his house.
>
> Q. Do you recall telling Mr. Diggs at that time that management did not want you to return because of your prior—because of his prior injuries?
>
> A. We might have talked about that.
>
> Q. Which management people didn't want him to return because of his injuries?

A. I would just say management. I wouldn't call no names. I don't remember if I even called a name.

Q. Right. I mean, you didn't tell him the names, but you did tell him that the management did not want him to return because of his injuries; is that correct?

A. Well, that was skeptical, not that he couldn't come back to work but management looks at things. … They would think that maybe he might get injured again or something like that….

*See* Isiah Waller deposition excerpts, Motion Exhibit 46, at 15:3-16:5. Mr. Waller later identified BNSF Superintendent Carter Tuggle as one of the "managers" who he recalled expressing "concern" about Mr. Diggs' potential return. *See id.* at 37:20-37:24, 41:2-42:3. "Nobody said, hey, we ain't going to let [Mr. Diggs] come back to work," Mr. Waller testified. *See id.* at 42:1-2.

For two reasons, the alleged comments by Mr. Tuggle to Mr. Waller are insufficient to save Mr. Diggs' claim from summary judgment. First, Mr. Tuggle's alleged remarks are insufficient to prove discriminatory animus against African Americans or disabled employees without inference or presumption and, even if uttered, were not related to the employment decision at issue or made by anyone with authority over that decision. Second, even if Mr. Tuggle's alleged comments did amount to direct evidence, they are inadmissible hearsay and hence incompetent to avoid summary judgment.

**A. Mr. Tuggle's comments are not "direct evidence" of discrimination by BNSF.**

First, Mr. Tuggle's alleged comments are not "direct evidence" of race or disability discrimination. A statement is "direct evidence" of disability discrimination, the Fifth Circuit ruled in *Rodriguez*, if it evinces animus without inference, relates to the plaintiff's protected class, occurs proximate in time to the challenged employment action, relates to that action, and is made by someone with authority over the decision. *Rodriguez*, 820 F.3d at 764-765. The *Rodriguez* Court ruled that a supervisor's comments did not constitute "direct evidence" when

the supervisor had only "expressed concern" about working with an employee with post-traumatic stress disorder, once saying, "I don't know if I can handle" the subsequently terminated plaintiff. *Id.* Those comments could not prove discriminatory animus without "inference or presumption" and did not relate to the challenged termination, the *Rodriguez* Court held, and thus did not amount to direct evidence of ADA discrimination. *Id.* at 765. Mr. Tuggle's comments are even weaker evidence than those rejected by the *Rodriguez* Court. First, like the *Rodriguez* supervisor's concern about being able to "handle" an employee with PTSD, Mr. Tuggle's alleged "concern" about Mr. Diggs' injury history does not show animus against African Americans or disabled individuals without inference or presumption. Second, that concern does not relate to the challenged employment action—the Medical Department's requirement that Mr. Diggs provide requested records from his medical providers for purposes of evaluating his fitness for duty. Third, Mr. Tuggle had no authority over or input into the Medical Department's determination of whether he was fit to return to work. As Mr. Waller, Mr. Tuggle and Dr. Gillis have all testified, medical return-to-work decisions are made by BNSF's Medical Department in Fort Worth. *See* Gillis Declaration, Motion Exhibit 17; Isiah Waller deposition excerpts, Motion Exhibit 46, 32:22-34:12; Carter Tuggle deposition excerpts, Motion Exhibit 47, at 19:16-25. Following its standard procedure in this case, BNSF's Medical Department requested Mr. Diggs' medical records and issued a fitness-for-duty determination promptly after receiving and reviewing them.

**B. Even if they would otherwise constitute direct evidence of prohibited discrimination, Mr. Tuggle's comments are inadmissible hearsay and thus insufficient to defeat summary judgment.**

Second, if it would otherwise amount to "direct evidence" of disability discrimination, Mr. Tuggle's alleged remark is inadmissible hearsay given Mr. Tuggle's uncontested lack of

authority over BNSF's challenged decision to require medical documentation from Mr. Diggs before allowing his return to work. Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted); Fed. R. Evid. 802 (providing that hearsay is not admissible); *Harris*, 635 F.3d at 692 ("Hearsay evidence inadmissible at trial cannot be used to create a genuine issue of material fact to avoid summary judgment").  In *Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959 (5th Cir. 2016) (on petition for rehearing), a plaintiff purported to offer "direct evidence" of pregnancy-related discrimination with a statement by a manager of another branch of the defendant's franchise that her pregnancy "was related to [her] termination." *Id.* at 966.  Because the plaintiff "failed to present any evidence that [the hearsay declarant] was involved in [defendant's] decision to terminate her," the Fifth Circuit rejected arguments for admitting the evidence under Fed. R. Evid. 801(d)(2)(D)'s hearsay exception for statements "offered against an opposing party" and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *Id.* at 966-967.  Ruled the *Fairchild* Court: "This exception does not apply to an employee's statement concerning a termination decision when that employee had nothing to do with that decision." *Id.* at 967 (citation omitted).  Such statements do not "concern a matter within the scope of" the employment relationship and instead are "made in [that employee's] capacity as wiseacre only." *Id*.  Here, too, Mr. Diggs has presented no evidence that Mr. Tuggle "had [anything] to do" with BNSF's decisions regarding Mr. Diggs' requests to return to work.  To the contrary, the record contains nothing to contest testimony by Dr. Gillis and Mr. Tuggle that the latter played no role in influencing the former's decisions regarding Mr. Diggs' request to return to work.  (*See* Gillis Declaration, Motion Exhibit 17 ("I received no communication from Carter Tuggle, directly or indirectly, regarding any opinion or concern he may have had

about Mr. Diggs' request to return to active duty. Neither Carter Tuggle nor any other BNSF operations manager, to my knowledge, attempted to influence my medical judgment of this matter."); Carter Tuggle deposition excerpts, Motion Exhibit 47, at 20:1-5.) Without such evidence, Mr. Waller's account of Mr. Tuggle's purported statement is inadmissible hearsay and, accordingly, incompetent as summary-judgment evidence.

Given the absence of any direct evidence of race or disability discrimination against Mr. Diggs by BNSF, he may only avoid summary judgment by relying upon indirect evidence evaluated according to the *McDonnell Douglas* burden-shifting framework.

## II. Mr. Diggs cannot establish a prima facie case of ADA discrimination with indirect evidence.

To make out a prima facie case of discrimination under the ADA, Mr. Diggs must show that (1) he is disabled, has a record of having a disability, or is regarded as disabled; (2) he is qualified for his job; (3) he was subjected to an adverse employment action on account of his disability or the perception of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). Assuming that Mr. Diggs can create at least a factual dispute about (1) his disability, (2) whether he qualifies for the position at issue, and (3) whether he has suffered a disability-motivated adverse employment action, the record is nevertheless empty of any admissible evidence sufficient to establish that he (4) was replaced by or treated less favorably than a non-disabled comparator.

### A. Mr. Diggs cannot make out the fourth element of a prima facie case because he cannot show that he was treated less favorably than a non-disabled comparator.

To establish a prima facie case of ADA discrimination, "it is Plaintiff's burden to show that [he] was replaced by someone outside of [his] protected class" or that he "was treated less

favorably than similarly situated employees outside the protected class." *Demarce v. Robinson Prop. Group Corp.*, No. 2:12-CV-34-SA-SAA, 2013 U.S. Dist. LEXIS 174048, at *17-*19 (N.D. Miss. Dec. 12, 2013) (Aycock, J.). That is, Mr. Diggs must either identify his replacement and show that he is not disabled or demonstrate that some non-disabled comparator faced "nearly identical" circumstances but received better treatment from BNSF. *Id.* But Mr. Diggs fails even to allege in his Complaint that some non-disabled person took his job or received more favorable treatment than he received from BNSF. And the record contains no evidence of such a replacement or the replacement's disability status.

So to establish his prima facie ADA case, Mr. Diggs must show that "he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). In *Lee*, the Fifth Circuit stressed that circumstances must match in multiple ways in order to qualify as "identical":

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in

> treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Id.* at 259-260. To sustain his ADA claim, then, Mr. Diggs must point to a non-disabled comparator who, despite having the same job responsibilities, a similar medical history, and having taken a medical leave of absence "nearly identical" to his, was treated more favorably by Dr. Gillis, the relevant decision-maker.

Mr. Diggs has identified four employees—Chris Caldwell, Mike Huffman, Eden Martin, and Brad Pierce—whom he believes were treated more favorably by BNSF than he was. *See* Motion Exhibit 48, Plaintiff's Responses to First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions by Defendant, at 2-3. Specifically, he says that those employees were allowed to return to work after medical absences without completing "return to work evaluations." *Id.* But there are at least three material distinctions between Mr. Diggs' case and those of these purported comparators. First, different lengths of time are at issue. Three of the four, Mr. Diggs concedes, were "off work for a few months"; Mr. Diggs, by contrast, had been off work for five years when he applied to return to work. *See* Complaint, at ¶6. As Dr. Gillis explained in undisputed testimony, BNSF requires detailed medical records, including completion of a return-to-work questionnaire, as a matter of "standard practice" from employees off work for more than a year. *See* Gillis deposition excerpts, Motion Exhibit 45, at 16:7-20. Second, no evidence exists to show that the injuries to Caldwell, Huffman, Martin or Pierce were as severe as Mr. Diggs' disabling condition. Third, the comparators' cases involved different decision-makers than Dr. Gillis. Indeed, Dr. Gillis' undisputed testimony is that she made no decision relative to the statuses of Caldwell, Huffman, Martin or Pierce. *See* Motion Exhibit 17, at ¶17.

Under such dissimilar circumstances, a reasonable jury would lack the identical characteristics required for a determination that Mr. Diggs received less favorable treatment than non-disabled comparators. For that reason, his ADA claim fails.[10] Having failed to show that BNSF treated him less favorably than non-disabled individuals, Mr. Diggs has failed to establish a prima facie case; therefore, his ADA claim is ripe for summary judgment.

**B. Even if Mr. Diggs had established a prima facie case of disability discrimination, BNSF remains entitled to summary judgment given its non-discriminatory rationale for the challenged action.**

Though he has failed to establish a prima facie case of disability discrimination, Mr. Diggs could not avoid summary judgment in any event given BNSF's articulation of a legitimate, non-discriminatory reason for requiring him to submit medical records before returning to work. *See, e.g., Burdine*, 450 U.S. at 253 (holding that employer's burden at this stage of the *McDonnell Douglas* analysis is one of production, not persuasion); *Sandstad*, 309 F.3d at 898 (reiterating that employer's proffered justification need not be persuasive or credible). As Dr. Gillis has explained, Mr. Diggs' medical records were necessary for BNSF to ascertain whether Mr. Diggs could safely perform the essential tasks of a demanding train-service job despite uncontrolled diabetes, myositis, and severe podiatric problems. Taken as true, as it must be at this stage of the analysis, BNSF's proffered justification is legitimate and non-discriminatory. *See Jefferson v. MillerCoors, L.L.C.*, 440 F. App'x 326, 330-31 (5th Cir. 2011) (finding that employer had cited a legitimate and non-discriminatory justification by citing

---

[10] Carter Tuggle's alleged comment regarding Mr. Diggs, discussed *supra*, is likewise unavailing as circumstantial proof of bias against Mr. Diggs under the Fifth Circuit's "stray remarks" doctrine. *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 & n.4 (5th Cir. 2003). "The remark must, first, demonstrate discriminatory animus and, second, be made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker." *Id.* at 583. Moreover, according to undisputed testimony from Dr. Gillis and Mr. Tuggle, the two have not even communicated about any subject. *See* Gillis Declaration, Motion Exhibit 17; Carter Tuggle deposition excerpts, at 20:1-5, Motion Exhibit 47. Thus, it is inconceivable that a reasonable jury could conclude Mr. Tuggle had influence or leverage over Dr. Gillis' decision.

employee's failure to produce requested medical records). Thus, Mr. Diggs could overcome summary judgment only by showing that the cited reason is pretextual.

### C. Mr. Diggs cannot show that BNSF's proffered reason for its action was pretextual.

But such a finding by a reasonable jury is inconceivable given case law from the Fifth Circuit and other federal courts. In *Jefferson v. MillerCoors, L.L.C.*, 440 F. App'x 326 (5th Cir. 2011), the employer requested updated restrictions for all employees who had permanent disabilities. The plaintiff initially neglected to comply, but eventually he submitted a doctor's note. *Id.* at 328. Jefferson filed claims of discrimination based on ADA, ADEA, and race under Title VII. The Fifth Circuit affirmed summary judgment for the employer, finding that Jefferson offered no valid evidence from which to find that the employer's proffered reason for its action was pretextual:

> Assuming without deciding that Jefferson established a prima facie case of disability discrimination, he has failed to rebut MillerCoors's legitimate non-discriminatory reason for placing Jefferson on inactive status. MillerCoors asserts that it placed Jefferson on inactive status because of his repeated failure to comply with requests that he update his Work Status Report with recommendations from an approved physician. MillerCoors required every employee with permanent restrictions to update his or her file with restrictions from an approved physician. Jefferson was the only employee who claimed to still need restrictions, but he failed to obtain the updated medical information. Jefferson has offered no valid summary judgment evidence to suggest that MillerCoors's explanation for its employment action is pretextual.

Id. at 330-31.

In *Moore v. CVS Rx Services, Inc.*, 142 F.Supp.3d 321 (M.D. Pa. 2015), the plaintiff experienced medical complications that limited her ability to work during and after pregnancy. She was placed on a leave of absence which her employer extended approximately fourteen times over the course of about 10 months. *Id.* at 326-27. The employer eventually dismissed her

because it did not receive requested documentation from her physicians. "Plaintiff acknowledges that she was given multiple opportunities to submit the necessary documentation, but notes that she ultimately did not supply it because she relied on her medical providers to do so." *Id.* at 332. The Middle District of Pennsylvania ruled:

> All told, the Court tallied fourteen approved leave extensions in addition to the initial approval of Plaintiff's first request, as well as a subsequent exchange of at least thirty letters and telephone calls between Defendant and Plaintiff. Several of those communications explained to Plaintiff her documentation's shortcomings, the process for correcting them, how she could contact someone should she have any questions, and the consequences of her continued failure to act. … There is no genuine dispute that Defendant acted with the requisite good faith when processing Plaintiff's requests in this case.
>
> In fact, were it not for Plaintiff's nurse practitioner failing to submit adequate documentation, and Plaintiff never seeing to it that those shortcomings were remedied, there is nothing in the record indicating that Defendant would have been anything other than cooperative when evaluating further leave extension requests by Plaintiff. A plaintiff cannot, as here, fail on her own end to adequately engage with her employer. As one court has previously described the required exchange of information between disabled individuals and their employers in ADA cases, "neither the law nor common sense can demand clairvoyance of an employer." *Conneen*, 334 F.3d at 331. Instead, an employer only can act on what an employee tells it and only can rely upon the sound judgment of medical professionals when selecting and approving the appropriate leave for a disabled individual.

*Id.* at 343.

After expressing its doubts that she even established a prima facie case of disparate impact under the ADA, the Court analyzed whether CVS' legitimate nondiscriminatory reason for terminating her was pretextual:

> Plaintiff's narrative depicts a drained [HR manager], worn by Plaintiff's many leave requests, spitefully sending Plaintiff the termination letter to put an end to all of the aggravation that Plaintiff has caused Defendant. The problem with that history is

> that there are simply insufficient facts supporting it—and certainly insufficient facts for that hypothesis to create a genuine dispute precluding summary judgment. Based on the record, the Court neither disbelieves Defendant's nondiscriminatory justification nor believes Plaintiff's charge of discriminatory animus.
>
> …
>
> Finally, and quite telling, the simple truth behind this case is that an employer who extends an employee's leave approximately fifteen times and engages in approximately thirty communications with that employee in an effort to assist her in the submission of the appropriate paperwork is not an employer who is discriminating.  ... At some point, an employee must take responsibility for her own shortcomings, rather than attempt to shift the blame to her doctor, nurse practitioner, or employer.

*Id.* at 347-48.

So, too, here.  After Mr. Diggs asked to return to work at BNSF in 2014, BNSF asked him for medical records regarding fitness for duty.  Over the months that followed, BNSF did not receive complete records, repeated its requests for them, and extended Mr. Diggs' vocational leave while it waited.  All told, BNSF's Medical Department sent Mr. Diggs at least 11 letters following his return-to-work request attempting to collect medical information needed to evaluate his fitness for duty.  While it waited, it extended his leave five times. There is simply no admissible evidence tending to prove that Dr. Gillis, the relevant decision maker, delayed her decision regarding Mr. Diggs' return-to-work request for any reason other than her lack of the requested records.

Even if Mr. Diggs had presented evidence sufficient to support a prima facie case under the ADA (and he has not), no evidence exists to support a finding of pretext.  Accordingly, the claim would still be subject to summary judgment.

**III.  Mr. Diggs cannot establish a prima facie case of race discrimination with indirect evidence.**

For similar reasons, the record lacks evidence sufficient to push Mr. Diggs' Title VII claim past the summary judgment stage.[11]  Under that statute, Mr. Diggs must show that "(1) he belongs to a protected group; (2) [he] was qualified for his position; (3) [he] suffered an adverse employment action; and (4) … in the case of disparate treatment, … similarly situated employees were treated more favorably."  *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2001)).  Mr. Diggs is (1) black, a member of a protected class. But, assuming (2) he qualifies for the position at issue and (3) he has suffered an adverse employment action, the record lacks admissible evidence sufficient to establish that he (4) was replaced by or treated less favorably than similarly situated employees who were not black.

**A. Mr. Diggs cannot establish the fourth element of a prima facie case of race discrimination because he cannot show that he was treated less favorably than a non-black comparator—or even that the decisionmaker was aware of his race.**

The fourth element of a Title VII prima facie case requires a plaintiff to show either that (1) he was replaced by someone outside the protected class or (2) other similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances. *Okoye*, 245 F.3d at 512-14.  As discussed above, no record evidence exists to show that Mr. Diggs has been replaced—indeed, he has returned to work—or treated differently than any comparator he identifies.  *See supra*, II.A.  Thus, his Title VII claim fails.

Moreover, federal courts have held that federal discrimination claims are subject to summary judgment when the plaintiff cannot show that the decision-maker even knew of his or her membership in a protected class.  *See, e.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n. 7

---

[11] And dismissal of Mr. Diggs' § 1981 claim is required for the same reasons.  *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 422 n.1 (5th Cir. 2000) (considering Title VII and section 1981 claims "under the Title VII rubric of analysis" because "[c]laims of intentional discrimination brought under Title VII and Section 1981 require the same proof to establish liability").

(2003) (observing, in context of ADA claim, that if a defendant "were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on [plaintiff's] disability. And, if no part of the hiring decision turned on [plaintiff's] status as disabled, he cannot, *ipso facto*, have been subject to disparate treatment."); *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (observing that *McDonnell Douglas* framework helps identify "proof from which a trier of fact can reasonably infer intentional discrimination" but holding that "the *McDonnell Douglas* elements would not rationally create this inference if, as here, a plaintiff offers proof that he is Black, but there is no showing by direct or indirect evidence that the decision-maker knew this fact."); *McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 533-534 (2d Cir. 2009). The *McDowell* employee worked for the employer in New York City, but the record established that the decision to terminate his employment "was made in far-away Washington, not locally in New York City." *Id.* at 533. Additionally, the "critical decision-maker" "did not know plaintiff's race until after this lawsuit began." *Id.* "Accordingly," the Second Circuit held, "plaintiff's case lacks critical evidence of discriminatory intent and cannot proceed past summary judgment." *Id.* Like the plaintiff in *Rodriguez*, Mr. Diggs complains of an action by a decision-maker in another city who "did not know plaintiff's race until after this lawsuit began." *Id.* Mr. Diggs hence also lacks "critical evidence" of intentional discrimination and fails to make out a prima facie case of it.

**B. Even if Mr. Diggs had established a prima facie case of race discrimination, BNSF remains entitled to summary judgment given its non-discriminatory rationale for the challenged action.**

For the reasons stated in § II.B, *supra*, BNSF has advanced a legitimate, non-discriminatory reason for its challenged action. Hence, Mr. Diggs can only avoid summary

judgment by pointing to facts from which a reasonable jury could infer that the proffered justification is pretextual.

**C.   No facts support a finding that BNSF's proffered justification is a pretext for race discrimination.**

As set forth in § II.C, *supra*, however, such facts are absent from the record.  Summary judgment is therefore warranted against Mr. Diggs' Title VII and § 1981 claims.

**<u>CONCLUSION</u>**

BNSF granted Christopher Diggs' return-to-work request after Mr. Diggs finally submitted all medical information BNSF's Medical Department sought to evaluate his fitness for duty after his years'-long medical leave.  The record lacks any admissible evidence that Mr. Diggs was treated differently because of his race or disability status, or even of a similarly situated employee who was treated more favorably by BNSF.  Therefore, the Court should dismiss all of the claims in Mr. Diggs' Complaint, with prejudice, taxing all costs to Mr. Diggs.

Respectfully submitted, this 7th day of November, 2016.

BNSF RAILWAY COMPANY

BY:   */s/ Benjamin Bryant*
      BENJAMIN BRYANT

R. Pepper Crutcher, Jr. (7921)
Benjamin Bryant (103623)
BALCH & BINGHAM LLP
188 E. Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
E-mail:  pcrutcher@balch.com
E-mail:  bbryant@balch.com

## CERTIFICATE OF SERVICE

I, the undersigned counsel, do hereby certify that on November 7, 2016, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following counsel of record:

> Jim Waide
> Ron Woodruff
> Waide & Associates, PA
> P. O. Box 1357
> Tupelo, MS  38802-1357
> Telephone:  662-842-7324
> Telecopier:  662-842-8056
> E-mail:  waide@waidelaw.com
> E-mail:  rlw@waidelaw.com
>
> W. Christopher Harrison, Esq.
> Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
> 6410 Poplar Avenue, Suite 300
> Memphis, TN  38119-4867
> E-mail:  chris.harrison@ogletreedeakins.com

> /s/ Benjamin Bryant
> BENJAMIN BRYANT