IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER C. DIGGS | * | |
| | * | |
| | * | |
| VS | * | CAUSE NO.: |
| | * | 1:15CV186-SA-DAS |
| | * | |
| | * | |
| THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY | * | |
| | * | |

ORAL DEPOSITION

OF

LAURA GILLIS, M.D.

JULY 6, 2016

ANSWERS AND DEPOSITION OF LAURA GILLIS, M.D., produced as a witness at the instance of the Plaintiff, taken in the above-styled and -numbered cause on the 6th day of July, 2016, from 9:22 a.m. to 10:19 a.m., before Deborah A. Copeland, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of Burlington Northern Railway, located at 2500 Lou Menk Drive, in the City of Fort Worth, County of Tarrant and State of Texas, pursuant to the Rules of Federal Procedure.

EXHIBIT
tabbies
16

APPEARANCES

FOR THE PLAINTIFF

MR. RON L. WOODRUFF
Waide & Associates, P.A.
332 North Spring Street
Tupelo, Mississippi 38804
662.842.7324
rlw@waidelaw.com

FOR THE DEFENDANT (Appearing telephonically)

MR. R. PEPPER CRUTCHER, JR.
Balch & Bingham, LLP
188 East Capitol Street, Suite 1400
Jackson, Mississippi 39201
601.965.8158
pcrutcher@balch.com



INDEX


| | |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| LAURA GILLIS, M.D. | |
| Examination by Mr. Woodruff | 4 |
| Corrigendum | 37 |
| Reporter's Certificate | 39 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | 7/30/14 Letter From Cheryl Renee Kimbriel | 8 |
| EXHIBIT 2 | 7/28/14 Letter From Cheryl Renee Kimbriel | 11 |
| EXHIBIT 3 | 7/7/14 Letter From Preston Boles | 11 |
| EXHIBIT 4 | BNSF Return to Work Questionnaire | 9 |
| EXHIBIT 5 | 7/22/14 Letter From George Housley | 14 |
| EXHIBIT 6 | 8/20/14 Letter From Laura Gillis | 15 |
| EXHIBIT 7 | Medical Status Form | 17 |
| EXHIBIT 8 | 11/08/14 Fax Cover Sheet with Attachment | 18 |
| EXHIBIT 9 | 11/24/14 Letter From George Housley | 21 |
| EXHIBIT 10 | 12/8/14 Letter From Laura Gillis | 24 |
| EXHIBIT 11 | 12/19/14 Letter From Christopher Diggs | 25 |
| EXHIBIT 12 | 1/2/15 Letter From Laura Gillis | 25 |





| | | |
|---|---|---|
| EXHIBIT 13 | 4/8/15 Letter From Laura Gillis | 27 |
| EXHIBIT 14 | Medical Status Form | 27 |
| EXHIBIT 15 | 7/1/16 Letter From Rachel Pierce Waide | 30 |
| EXHIBIT 16 | 4/21/16 Letter From Rachel Pierce Waide | 29 |
| EXHIBIT 17 | Statement of Job Awareness | 31 |
| EXHIBIT 18 | 6/23/16 Letter From Rachel Pierce Waide | 30 |
| EXHIBIT 19 | 3/4/16 Letter From Rachel Pierce Waide | 28 |




PROCEEDINGS

MR. CRUTCHER: We can stipulate that we can avoid the reading of the preliminaries that would otherwise be required by Rule 30(b)5 .

MR. WOODRUFF: And that this deposition be taken pursuant to the rules of Federal Procedure.

MR. CRUTCHER: Yes.

MR. WOODRUFF: All objections except as to form are for trial.

MR. CRUTCHER: Yeah. I think that's in the Rules anyway, but, yes.

LAURA GILLIS, M.D.,

the witness, being first sworn, testified as follows:

EXAMINATION

BY MR. WOODRUFF:

Q Please state your full name for the record.

**A Laura Girandola Gillis.**

Q And Dr. Gillis, we're doing this by phone. I'm in Tupelo, Mississippi, and you are in, I believe, Fort Worth, Texas?

**A** Yes.

Q And so if you don't understand what I say or you need me to speak up or whatever, please let me know. Obviously it's a little more difficult doing these by phone than it is in person, but we've done

many of them, so we'll get through this.
Dr. Gillis, where do you currently work?
A I work at the corporate headquarters for BNSF Railway.
Q Does that mean you are an employee or an independent contractor?
A I am an employee.
Q How long have you worked for BNSF?
A Three years.
Q And today is July 6, 2016, so it would be sometime around the summer of 2013 is when you started?
A The last week of June 2013 I started.
Q And you are a doctor. What are you a doctor in?
A I hold a medical degree with a specialty in occupational and environmental medicine. I also have a master's in public health.
Q When and where did you get your doctorate?
A I received my medical degree from Yeshiva University's Albert Einstein College of Medicine in 1994.
Q Who do you report to?
A I report --
Q Who is your direct supervisor?



A Dr. Michael Jarrard, the AVP of the medical and environmental health department.
Q Do you know who Dr. Jarrard reports to?
A He reports to Mr. Riz Chand, who is the vice president of human resources, HR medical.
Q Do you have any employees working underneath you?
A Yes, I do.
Q And who would they be? How many?
A How many? Exact number, maybe 17. I supervise the field medical team, as well as I have three people that take care of compliance, one of whom is an RN who does return to work.
Q Who is Cheryl Renee Kimbriel, K-i-m-b-r-i-e-l?
A She is a medical specialist.
Q Is she someone in your chain of command?
A No. She is not.
Q Has she ever been in your chain of command?
A No. She has not been.
Q Do you know who she reports to?
A Yes.
Q Who would that be?
A Mr. Chris Kowalkowski.
Q Do you know whether she still works for the



company?
A Yes. She does.
(Exhibit 1 marked.)
Q All right. Let's start with Exhibit Number 1. We have 19 exhibits that have been premarked that the court reporter has. We're going to go through these exhibits. And let's start with Exhibit Number 1. Take whatever time you need to review and just let me know when you're ready to answer questions.
A I'm ready.
Q All right. Have you ever seen this document before?
A I've seen documents like it, yes.
Q Okay. And this is sent from Cheryl Renee Kimbriel. Would she be the person to send this document out initially?
A She is one of several people that would send a document like this, yes.
Q Okay. All right. And let's go through it. It's to Mr. Diggs from Ms. Kimbriel. Talks about the process of returning to work after an extended absence. It says, The first step for duty process is the completion by you of the attached medical questionnaire. And if you look at Exhibit Number 4,



is that what she's referring to there?
(Exhibit 4 marked.)
A Yes. That is a -- Exhibit 4 is a copy of the medical questionnaire.
Q Okay. So that's been completed; is that correct?
A Yes.
Q It says, Once a completed form is received and reviewed, a determination will be made as to the need of a physical examination.
Do you know whether or not Mr. -- there was a determination whether or not Mr. Diggs needed a physical examination?
A I would have to look in our records to see what the immediate next step was. In general, however, we would look at -- the normal course of the process is we would look at the questionnaire and we would not necessarily order an exam until any further information that might be necessary was already asked for.
Q So as you're sitting here today, you do not know whether or not a physical examination was required of Mr. Diggs?
A I don't know that without looking at the records.

Q I've never seen any document that said that. I don't recall seeing any document that says anything about requesting a physical examination, but as far as you know there wasn't -- that wasn't required?

**A I don't -- again, I would need to really look at the record to be 100 percent sure. But, in general, I think what happened was we asked for additional information, which we would normally do prior to getting any exam that might be needed. And since we never received that information, we never got to potentially asking for an exam.**

Q All right. If your absence has been greater than six months, which it was in this case, you are also required to complete a return to work drug screen. Do you know whether or not he was required to do that?

**A I do not believe that he was. The drug screen is generally the last thing that we do prior to bringing an employee back on property.**

Q Well, then the next sentence says, I will contact you about the drug screen and the possibility of an exam once your completed questionnaire has been reviewed.

So I'm a little confused here. It says that the drug screen and the possible exam will be --



once the completed questionnaire has been reviewed, and the questionnaire has been sent in as of August 4, 2014.

**A Correct. Once the questionnaire is reviewed, if there are medical conditions or situations that potentially need further information prior to determining fitness for duty, we would ask for that prior to doing an exam or a drug screen.**

**(Exhibit 2 marked.)**

Q All right. Looks like we got a -- we somehow have them out of order, but Exhibit 2 appears to be the exact same letter just a different date on it. The Exhibit 1 was July 30, 2014, and then Exhibit 2 was actually sent two days before, July 28, 2014.

**A They have different addresses.**

Q Okay. Do you know why the issue about -- issue about had wrong address or something?

**A I have no idea. You'd have to ask Ms. Kimbriel.**

**(Exhibit 3 marked.)**

Q Okay. Hopefully I'll get a chance. Let's go to Exhibit Number 3. Once again just tell me when you're ready.

**A Okay. I'm ready.**

Q All right. And this is from Preston Boles,



one of his doctors. Do you know what Dr. Boles was treating Mr. Diggs for?

**A No, I do not.**

Q It's my understanding he was treating him for his foot, but you're not aware of that?

**A Well, he's a podiatrist, so I assume it's his foot, but I don't know the specific condition that he was treating Mr. Diggs for.**

Q All right. And it says he can come back to work in four weeks. It says August 4th, 2014. Do you have any reason to doubt Dr. Boles' credentials or treatment which says that he's able to come back to work on August 4th, 2014?

**A I have -- I have no reason to doubt his credentials. There were prior records in Mr. Diggs' case that indicated that his foot conditions were very significant, to the point that he couldn't return to work. So this note alone would not have been sufficient for us to put Mr. Diggs back to work without further information.**

Q Such as what information?

**A Generally we would look for the office visit notes to see what kind of problems Mr. Diggs was having, what his diagnoses were at that time, what the treatment plan was, the stability of his case, things**



**like that.**

Q So are you saying this is a standard form that when a doctor releases his client back to work, you don't necessarily take the doctor's word for it?

**A It's a holistic approach. It depends on the condition that is in question, as well as, you know, if we have a history, like we did with Mr. Diggs, that he was having significant problems and it was impacting his ability to work before. And now he's off, and at this time, it's indicating he still needs another four weeks before he's going to be ready, that indicates to me that there's a significant problem going on and, obviously, we want to make sure he's able to safely return to work.**

**So, yes, I'd want to have more information.**

Q All right. Exhibit Number 4 we've already talked about. Are you claiming there's anything deficient in this questionnaire he filled out?

**A Deficient in what way? I'm uncertain of the question.**

Q You know what deficient means. There's something lacking here, something he didn't put in here?

**A I can't tell you what he didn't put in here.**

**What's in here seems reasonable.**
**(Exhibit 5 marked.)**
Q Fair enough. Let's go to Exhibit Number 5. George Housely, it's a letter. Do you -- have you had a chance to review the document?
**A Yes.**
Q And you see that he's released to work on August 4th with no restrictions; is that correct?
**A Correct.**
Q All right. And do you know what Dr. Housely was treating Mr. Diggs for?
**A I am -- now I know what Dr. Housely was treating him for. I'm uncertain if I knew back then what he was treating him for.**
Q Do you have any reason to believe that Mr. Housely, who's his family physician treating him for his rheumatoid arthritis, is incompetent in assessing whether or not he can return to work with any -- with no restriction?
**A I'm sorry? Can you repeat that question?**
Q Do you have any reason to believe that Dr. Housely, who has released Christopher Diggs to return to work on August 4th, 2014, with no restrictions, is incompetent to make such an assessment?



**A No. I believe Dr. Housely was doing what he thought was correct in this case.**
**(Exhibit 6 marked.)**
Q All right. Let's go to Exhibit Number 6. This is the first document I see with your name on it. Are you aware of any other document or involvement you had with Mr. Diggs' situation prior to Exhibit Number 6, that letter?
**A I've written so many letters, I'd really have to look at the record to tell you for sure. I don't know at this time.**
Q All right. Take a look at this and let me know when you're ready.
**A Okay.**
Q All right. In Paragraph 1 you're asking Dr. Boles other information.
**A Correct.**
Q Number 2, you're asking for Dr. Housely. Number 3 is Dr. Housely. And 4 deals with the diabetes.
**A Correct.**
Q Is this a standard letter you send out?
**A Each letter is different based on the individual and the issues at hand, but this is similar to other letters that I've sent out for lots of other**



**employees.**
Q Is there a certain length of time that a -- is there a certain amount of time that a person, employee is out where they're treated differently as far as the requirements about what they need to go back to work?
**A In general, no. The only caveat, we use the medical questionnaire for extended absences. That's really the main one. Where if you've been out longer than a year, then you fill out the questionnaire just to give us a sense -- because a lot of things can happen in a year or more.**
Q So what do you consider extended?
**A A year. A year or more.**
Q Is there some policy that says that or is that something you do?
**A You know, I'm not familiar -- I can't recall if there's an instruction somewhere or not. There might be. I'm not sure, but that's our standard practice.**
Q So as far as you know, there's no policy written down somewhere that it's after a year you have to follow this procedure that you did in this case?
**A Again, I'm -- I can't recall a specific one, but that doesn't mean there isn't one.**



**(Exhibit 7 marked.)**
Q All right. Let's go to Exhibit Number 7. Have you seen this document here before?
**A Yes, I have.**
Q All right. Tell me what is insufficient with this document here. And for the record, this is from Dr. Glasgow who's treating him for his diabetes. I think you had requested a form filled out by Dr. Glasgow. What is insufficient about this document here?
**A The medications prescribed, dosages and frequency is not filled out. The next scheduled appointment is not filled out. The hemoglobin A1C was not attached as was requested.**
Q All right. And I don't see the other attachment, but this is listed as a five page -- if you look at the top right, it has 1 of 5. So there was four pages attached to this. For some reason I don't see the other four pages that were provided. Are you aware whether or not his medical records were attached to this document?
**A I don't know. I can't tell you that without looking at the medical record.**
Q Can you --
**A I know that I never saw an A1C and I didn't**

have the rest of the information.
Q Would there be somewhere in the file you have, which would have all five pages of this fax?
A I don't know without looking at the record.
Q Will you look at the record and provide that to your attorney so he can supplement in discovery, because what I've seen only has one page of the five-page fax?
A Okay.
(Exhibit 8 marked.)
Q Let's go to Exhibit 8. This is faxed directly to you from Preston Boles at the Greenwood Leflore Foot Clinic; is that correct?
A No. Nothing comes directly to me.
Q All right. Who would it go to?
A I'm not really sure where that fax number goes to. Generally it's a group mailbox, so -- but I'm not entirely sure which one. There's so many fax numbers in play.
Q All right. And it says 1 of 2 and the next page is 2 of 2. Have you seen this document before?
A I think so. I'm not sure, actually.
Q Would you agree that this is a two-page fax? Will you look at the fax information at the top. It says two pages. Its intended recipient is you at BNSF



Railway. You don't know whether or not they forwarded this to you?
A If it's in the record, then I've seen it. Like I said, there's a lot of documents with this file, so do I recall this specific one, not necessarily. More likely than not, yes, I have seen it. And, yes, it is a two-page fax.
Q You keep referring to the record. Tell me what this record is. Is this something on a computer? Is this a file with paper in it? What is this record you keep referring to?
A It's our electronic recordkeeping system, so it is on the computer.
Q So -- I'm sorry, you said you had written copies or just on a computer?
A Employees -- for this kind of -- this case, he'll have an electronic medical record, but he may also have a paper file that has other older information. It may have some of the information from his current case, such as the hard copies of all the records that you've sent in to us may be in there. So he may have both a hard copy file -- but the majority of the records are in the electronic medical file.
Q Well, when is the last time -- didn't you review this file before your deposition today?



A I reviewed the electronic file because that has all of the current information in it.
Q And that would be called Christopher Diggs' electronic file? What would it be if I asked for that in discovery?
A Christopher Diggs Opus file, O-p-u-s. That's the name.
Q O-p-u-s?
A Yes. That's the name of the electronic file.
Q All right. If you look at the second page of Exhibit Number 8, it says, He's currently under my medical care and found fit and able to return to work at this time. And it says he can return on December 1st, 2014.
A Correct.
Q No restrictions.
A Correct.
Q Do you have any reason to doubt that Preston Boles is not capable of determining whether or not his client, who he's treating for his foot issues, is not -- not able to return to work without any restrictions?
A I think that Dr. Boles made the -- made what he thought was the right decision with the information he had at the time.



Q Do you have information -- access to information he doesn't? You've never even seen Christopher Diggs, have you?
A No. But a lot of times providers will make fitness decisions based on what the employees are telling them. And it's not uncommon that the employees paint a picture that might not necessarily include all of the pertinent information that may impact their ability to go back to work safely.
Q Other than what is provided by the doctor, like in this case, Preston Boles who treated Mr. Diggs for his foot, what other information do you have access to concerning Mr. Diggs' foot issue?
A I'm sorry? Can you repeat that?
Q Aren't you totally relying upon Dr. Boles' medical records and examination in making your assessment?
A I rely on his evaluation and his medical record, as well as my knowledge of the operational environment and what Mr. Diggs would potentially need to do as part of his essential job functions going back to work. I did not have Dr. Boles' records, so I couldn't see what he saw.
(Exhibit 9 marked.)
Q Take a look at Exhibit Number 9. Do you

recognize this document here?
A Yes.
Q It's from Dr. Housely. It's a follow-up to his previous letter. It says, I enclose all of my visit notes with Dr. Diggs. Any further narrative will be both duplicative on my part and not contemporaneous. What did you understand him to mean?
A Well, that the records speak for themselves, which is exactly why I wanted to see them.
Q Are you claiming that on November 24th, 2014, you had not seen the records?
A No. I had not.
Q Are you aware that Dr. Housely has a record of repeatedly sending you the records?
A I was told that well after the fact. And, in fact, I believe there is a record from -- there's a letter from me somewhere, maybe it was in January of 2015, one of my letters specifically said -- asked for the records that were supposed to have been included, if I remember correctly. So I indicated to Mr. Diggs that I had not received the records.
Q Do you have --
MR. WOODRUFF: Let's go off the record real quick.
(Recess taken from 9:54 to 9:55.)



Q (By Mr. Woodruff) Exhibit Number 8 attached to Dr. Housely's record includes this Exhibit Number 9 and then there are --
A Exhibit 8 includes Exhibit 9?
Q Dr. Housely's.
A Okay.
Q In Exhibit 8 after Dr. Housely's exhibit, there's 25 confirmations where it says that all pages in the fax were successfully transmitted and was faxed by Alicia Walker in Dr. Housley's office to Laura Gillis, M.D. Have you ever seen these documents before?
A We're not seeing them now.
Q I understand. But have you ever seen -- yeah. Good point. Let me ask you this. Are you familiar with fax number 918173527? No. That's not the fax number. Let me find the fax number. There's no phone number. What is your fax number?
A Quite honestly, I don't even know it offhand. It's on the top of the letterhead that goes out. It's probably -- I know it's on my business card, but I can't tell you what it is offhand.
Q Okay. All right. Did you -- these are all dated 12-11-2014. There's 25 confirmations of faxes sent to you. And on it, it says the fax was



successfully transmitted. Is it your position you didn't receive these 25 faxes from Dr. Housely on or about December 11, 2014?
A I don't know what was in the faxes. All I can tell you is what we received is currently in his file.
Q And, once again, we're talking about that Opus file for Mr. Diggs?
A Correct.
Q We're going to request that in discovery. Let's go ahead and move on.
(Exhibit 10 marked.)
Exhibit Number 10, please, take a moment to look at that and just let me know when you're ready.
A Okay. I'm ready.
Q Do you recognize this document here?
A Yes.
Q And is this a document that you produced?
A Yes.
Q Looks like for Number 1 it looks pretty similar to what you wrote in your last letter. Is that correct?
A Correct. The lead-in statement says, As a reminder, we're requesting you to submit the



following. It's similar to what we wrote before that we didn't get a response to.
(Exhibit 11 marked.)
Q All right. Exhibit number 11. I just have the cover letter here. It's from Christopher Diggs to you dated December 19. It says, Enclosed you will find correspondence from my treating physicians. Prayerfully this information will suffice for your requirements for my return back to work for BNSF. Do you remember getting this document?
A I do, vaguely, yes.
Q Do you recall what was attached to it?
A Not without looking at the electronic medical record.
(Exhibit 12 marked.)
Q Okay. Let's go to Exhibit Number 12. Is that your response to this letter?
A Correct. We waited a little bit of time thinking that there may be more coming in. That's what I remember. And then after the holiday when nothing further had come through, I wrote the letter in response to what we had received.
Q And in 1 you talk about not receiving the notes from Dr. Housely, but we talked about those 25-plus faxes to you, but you don't know whether you

26

got those or not?
**A No. I did not -- if those faxes contained Dr. Housely's medical records, then, obviously, I did not get them, because otherwise I would not have put this in there.**
Q Let me just ask you this. Are you aware of any statement from any of his three doctors treating the three main problems, Dr. Glasgow for the diabetes, Dr. Boles for his foot, Dr. Housely for his rheumatoid arthritis, and I think his myosis, whatever it's called, do you recall any statement from them since 2014 that says that he is not able to return back to work?
**A I would not be able to answer that question without looking through the records again. And, again, because I've gotten all of those records in the last few weeks, I can't tell you whether or not there's something in there that may impact his ability to come back to work, necessarily.**
Q Right. But my question, though, is, you know, I've seen -- we've gone through letters from Boles -- Dr. Boles, Dr. Housely and Dr. Glasgow all say that he is cleared to return to work by them and they are the people actually treating Mr. Diggs for his issues. Have you seen any document from the time

27

they had released him to return to work in 2014 up to the present that says they believe he's not able to return to work?
**A I don't believe so, but, again, I'd have to check the records to be sure. Their opinion is that he may return.**
Q All three of them?
**A I believe so.**
Q And you have nothing to -- do you know how many years each of those doctors have been practicing in their particular field?
**A No, I do not.**
**(Exhibit 13 marked.)**
Q All right. Let's go to Exhibit Number 13. This is dated April 8th, 2015.
**A Okay.**
Q You're claiming that the information he sent was incomplete and not sufficient. Is this just a follow-up letter?
**A Yes. And it included the previous letter from January 2nd encouraging the employee to submit the information so that we could review it and get him back to work, if possible.**
**(Exhibit 14 marked.)**
Q All right. Let's go to Exhibit 14. Once

28

again, it's a letter from -- actually a form that's filled out by Dr. Glasgow. Do you recall receiving this? It's dated April 21, 2015.
**A Potentially. I don't know. Like I said, there's been a lot of documentation, and without having the medical record in front of me, I can't say for sure, but it looks familiar.**
Q Okay. Once again, Dr. Glasgow, who's treated him for his diabetes, says he is able to return to work; is that correct?
**A Correct.**
**(Exhibit 19 marked.)**
Q All right. Let's go to 15. And this one is -- we're out of order again. Let's go to 19 next, because that's the next one in order. This is from our firm. And, obviously, we sent numerous documents, it looks like, going from Bates number 147 up to 608, so we're talking about 450 pages of medical documents, with correspondence from Dr. Boles, correspondence from Dr. Glasgow. Do you recall receiving this letter from our office?
**A Yes.**
Q Can you tell me, once you received this, what -- you claiming after you received this you didn't have all the medical records from these

29

particular doctors?
**A I believe that once I reviewed all of the records, there was a letter from me that went out, which is not included in -- I don't see it here, in your exhibits. There was a letter that went out to Mr. Diggs indicating what issues were still -- that still needed to be addressed.**
Q Do you recall what the date of that letter was?
**A Without the record in front of me, I really can't tell you, but a letter did go out.**
**(Exhibit 16 marked.)**
Q Let's go to Exhibit Number 16. It says -- it looks like it says, Mr. Diggs provided me a copy of your letter of March 22, 2016. And so I imagine -- does that sound about when you sent that letter out?
**A Again, I can't tell you exactly when it was. I would really need to have the electronic record in front of me.**
Q If you needed that to do your deposition, why didn't you bring it with you?
**A I was advised that all of the records that were needed were going to be provided.**
Q Don't tell me what your attorney said.
**A No. That's been my experience throughout all**

of my depositions, that all of the records that I need are -- have generally already been asked for. And the Opus record is generally one of the first things that the attorneys ask for.

Q All right. Do you recall receiving this letter from our office?

A I believe so. Not specifically, since there has been a lot of correspondence, but it looks familiar.

(Exhibit 18 marked.)

Q All right. And then I don't have the attachments to it, but let's go to Exhibit Number 18. It's another letter from our firm.

A Yes.

Q Do you recall receiving this letter?

A Yes.

(Exhibit 15 marked.)

Q And then we've got Exhibit Number 15, which is dated July 1st, 2016. Do you recall receiving this letter?

A Actually, that package just arrived either last night or this morning, because when I was getting coffee, I saw it in my mailbox. I had emptied my mailbox yesterday and it wasn't there. So this may be the package that just came today. So I have not



opened -- I've opened it, but I haven't look through it yet. I didn't have time. I had to come here.

(Exhibit 17 marked.)

Q All right. Exhibit Number 17, the last exhibit is another letter from Dr. Glasgow and a form. And have you seen this before?

A I don't know if -- I can't -- I don't know if I've seen this specific one. Again, there's been so many that have come through in the last couple of weeks. So possibly I've seen it.

Q All right. It's referred to in the June 23, 2016, letter sent to you from my offices.

A Okay. Then I've seen it, because I was able to go through all of that. So if it was in that E-mail stuff, then I did see it.

Q All right. As you sit here today, can you tell me in what way -- what Mr. Diggs has not provided over the last year, over a year and a half that still makes it unable -- makes it unable for you to determine whether or not he can return to work?

A Sure. So Mr. Diggs has several chronic medical problems that are significant. You referred to Dr. Glasgow's release to return to work. Dr. Glasgow is his primary care physician who is treating him for his diabetes. According to the very



last set of records that you-all mailed to me, his last appointment with Dr. Glasgow that I have a record for, is from April of 2016. At that appointment, his diabetes was uncontrolled. That note, plus several other notes I believe indicated that Dr. Glasgow was considering putting him on insulin.

So with Mr. Diggs' uncontrolled diabetes, that can definitely have an impact on his foot status, which is how this whole thing started was Mr. Diggs couldn't work because of his foot problems. So now I have a situation where his diabetes is uncontrolled, can definitely have an impact on the status of his feet. And if they're considering putting him on insulin, patients generally in safety sensitive positions need a period of time to adjust to being on insulin to ensure that they're getting the dosage right, they're not getting hypoglycemic, becoming impaired, et cetera.

So that would impact his ability to come back. I don't know his current status. I don't know his current routine. It also leads to the status of his feet. While Dr. Boles talked about him being cleared and fit for duty, there were conditions that were mentioned previously in this case when it all started back in 2013, '14 when he was having surgeries



and was unable to work, his podiatrist at that time indicated that he was totally disabled, and that if he went back to working in any form on uneven surfaces, doing a lot of walking, et cetera, like he would need to do as a conductor, that it could potentially lead to him needing his foot amputated.

We certainly didn't want that situation. So I needed a more current status of his feet. In addition, the note from Dr. Glasgow in April of 2016 indicated that he now had calluses on his feet. And I think it was both feet. I'm not sure. I'd have to look at that record again. But that's indicating -- and that's a change from previous notes from Dr. Glasgow. So now that indicates that his foot status potentially may be changing.

So I would want an updated status of his foot situation from a podiatrist with any recommendations for potentially boot -- special boots. We have boots for diabetics that work better with special socks. We could offer him that, and that was something that was offered to him way back when, when this whole thing started that he apparently declined at the time. But I wanted to see if that was a potential that could help him back into the workplace.

The whole thing with Dr. Housely, and

the myositis. This issue of the myositis is not very clearly defined in the notes and by the diagnosis. It's kind of -- there's a great variability in how patients present and how their functionality may be impacted. So I was -- I am concerned about Mr. Diggs' status with Dr. Housely and the myositis, in that it appears from the records that I currently have that there have been some changes in Mr. Diggs' medication regimen in regards to his myositis.

And the concern that seems to come from Dr. Housely's records was that, you know, once he got off of the Prednisone, he kind of changed the Methotrexate dosage himself, those things could potentially trigger another flare of his myositis.

So I really am interested in the June 30th notes from Dr. Housely's visit to see what Mr. Diggs' current status is. And at that point, we would consider a conversation with Dr. Housely to see what the course and the prognosis for this condition is.

Generally folks with this condition could potentially have weakness in their muscles in their legs and their extremities. So to Mr. Diggs, who has to do a lot of walking, potentially claiming on railcars, lifting knuckles, I certainly don't want to put him in a spot where I'm putting him into an



environment that can worsen his condition. So I want to make sure that Dr. Housely understands that. And that while Mr. Diggs is okay in sort of a benign environment, the environment that we're working in is subject to lots of weather, potentially more exertion, that kind of thing.

So those are the things that I would look for, and I have been asking for.

Q Have you ever considered having your own doctor do an evaluation of him?

A We generally don't do that.

Q So the answer would be no?

A No. In general, we have a workforce of, what, over 40,000 people. We rely on the interactive process with the employees' physicians. Generally there's -- most physicians are willing to talk to us and we can discuss it and work it out without having to send somebody for an independent medical evaluation sort of situation.

Q As for Mr. Diggs' three doctors, have you had an issue with getting the information from them; is that what you're saying?

A Yes. I don't know if it's from the doctors or if it's somewhere else in the process, but I've asked for the information multiple times and have not



received it. I've received pieces of it.

MR. WOODRUFF: I don't have any other questions. I tender the witness.

MR. CRUTCHER: None.

MR. WOODRUFF: We're all set.

MR. CRUTCHER: Yes, sir.

THE REPORTER: Is she reading and signing?

MR. CRUTCHER: Yes.

(Deposition concluded.)



CHANGES AND SIGNATURE

WITNESS NAME: LAURA GILLIS, M.D.

DATE OF DEPOSITION: JULY 7, 2016

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

I, LAURA GILLIS, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________________
LAURA GILLIS, M.D.

STATE OF TEXAS )

Before me, ____________________ on this day personally appeared, LAURA GILLIS, M.D., known to me (or proved to me under oath or through ____________) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____day of ___________________, 2016.

__________________________
Notary Public in and
For the State of ______________



STATE OF TEXAS X
COUNTY OF DALLAS X

I, Deborah A. Copeland, a Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, do hereby certify that there came before me on the 6th day of July, 2016, in the offices of Burlington Santa Fe Railway, located at 2500 Lou Menk, in the City of Fort Worth, State of Texas, the following named person, to-wit: LAURA GILLIS, M.D., who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this cause; and that XXHE/SHE was thereupon examined upon XXHIS/HER oath and XXHIS/HER examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness.

I further certify that pursuant to FRCP Rule 30(e) that the signature of the deponent:

__X_ was requested by the deponent or a party before the completion of the deposition, and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript:



___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of July, 2016.

Deborah A. Copeland

__________________________
DEBORAH A. COPELAND
Texas CSR 5730
Expiration Date 12/31/17
DepoTexas - Dallas No.459
6500 Greenville Avenue
Suite 445
Dallas, Texas 75206
(214) 373.4977
(214) 363.7758 (fax)
(800) 363.9554